IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2023

IN RE AZELEA B. ET AL.

Appeal from the Juvenile Court for White County
No. JV-2155/5226          John Meadows, Judge

No. M2023-00656-COA-R3-PT

In this case involving termination of the father's and mother's parental rights to two of their minor children, the trial court determined that three statutory grounds had been proven as to each parent by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's and mother's parental rights was in the children's best interest. The father and mother have each appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

J. Brad Hannah, Smithville, Tennessee, for the appellant, Issac B.

J. Patrick Hayes, Cookeville, Tennessee, for the appellant, Heather B.

Jonathan Skrmetti, Attorney General and Reporter, and Kathryn A. Baker, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

This case focuses on Azelea B. and Phoenix B., the minor children ("the Children") of Issac B. ("Father") and Heather B. ("Mother"). The Children, who are twins, were two days old and in the hospital following their birth in April 2021 when the Department of Children's Services ("DCS") responded to a referral averring that the Children had been exposed to drugs. It is undisputed that the Children had tested positive

for opiates and methadone at birth and had been diagnosed with Neonatal Abstinence Syndrome. DCS subsequently referred the Children to Tennessee Early Intervention Services ("TEIS"). Although the parents were not married, Father was named on the Children's birth certificates, and it is undisputed that he is the Children's biological father.

On May 14, 2021, DCS filed a petition in the White County Juvenile Court ("trial court"), alleging that the Children were dependent and neglected as to both parents due to the Children's drug exposure. DCS averred in the petition that when interviewed by DCS case manager Emily Lewis, Mother had admitted using drugs during pregnancy, and Father had admitted knowing that Mother was using drugs while pregnant with the Children. DCS specifically alleged in pertinent part:

> On April 27, 2021, [Ms. Lewis] contacted [C.F.], a social worker at Erlanger Hospital in Chattanooga, Tennessee. [C.F.] reported that [Mother] and [Father] were currently present at the hospital for the first time since the [C]hildren had been admitted. [C.F.] confirmed that [Mother] and the [C]hildren had tested positive for opiates and methadone. [C.F.] advised that Azelea was being medicated with morphine and clonidine and Phoenix was being given morphine. According to [C.F.], [Mother] admitted to using heroin about three weeks prior and to taking pills and methadone during her pregnancy. [C.F.] explained that [Mother] and [Father] had admitted to a history of drug use.

> On the same date, [Ms. Lewis] observed the [C]hildren. By then, both [C]hildren had been placed on morphine and clonidine to ease withdrawal symptoms. The [C]hildren were diagnosed with neonatal abstinence syndrome, born premature at an estimated [] thirty-five weeks and six days, and received little prenatal care.

> On the same date, [Ms. Lewis] met with [Mother] and [Father] at the Ronald McDonald House in Chattanooga. [Mother] acknowledged her substance abuse. [Mother] stated that she had started attending a methadone clinic to combat her addiction. [Mother] reported that she had been on buprenorphine in the past but had gone to methadone due to an allergic reaction.

> * * *

> [Mother] admitted that she had been taking buprenorphine. [Mother] further admitted that she had only stayed sober for a while before

- 2 -

her relapse, which was on the day before she found out she was pregnant. [Mother] further admitted that she had been "snorting" heroin. [Mother] explained that she eventually found Volunteer Comprehensive Site in Chattanooga for methadone.

[Mother] admitted that she "used" during her pregnancy anytime she had withdrawals, usually every three-to-four days depending on how she felt. [Father] claimed that a doctor had instructed [Mother] to use heroin to prevent the [C]hildren from withdrawing in utero. [Mother] stated that she had quit "using" since being on methadone. [Mother] admitted that she last used heroin about one and a half to two weeks ago.

[Father] admitted to a history of drug use and stated his drug of choice was opiates. [Father] claimed that he had not used in three or four months. [Father] admitted that he was aware [Mother] had been using heroin during her pregnancy.

DCS requested an immediate protective custody order and placement of the Children with their paternal grandparents, J.B. and B.B. ("Paternal Grandparents").

DCS noted in the dependency and neglect petition that it had been involved with the family in the past concerning the parents' one-year-old child, Ayra B., who was in the custody of a maternal aunt, M.W. ("Aunt"). Although DCS was not a party to any custody action concerning Ayra, DCS had become involved in Ayra's case because Mother allegedly had used buprenorphine during her pregnancy with Ayra. Mother also reported to the case manager at the time of the Children's removal that she had a five-year-old child, Lydia B., who was in Mother's ex-husband's custody and with whom she was allowed only supervised visitation.

The trial court entered an *ex parte* order on May 14, 2021, bringing the Children into the protective custody of the court and awarding temporary legal custody of the Children to Paternal Grandparents. The court directed that all contact between the parents and the Children must be directly supervised by DCS or an individual approved by DCS. Setting the case for a preliminary hearing, the court gave notice to the parents of the obligation to provide child support for the Children and stated that support would be set during the hearing. The court appointed attorney Macey Gurley as a guardian *ad litem* ("GAL") to represent the Children's best interest.

Following two continuances and upon Mother's waiver of a preliminary hearing, the trial court entered an order on July 19, 2021, finding probable cause that the Children were dependent and neglected as to Mother. Following a subsequent hearing, the trial

- 3 -

court adjudicated the Children dependent and neglected as to Mother in an order entered on October 5, 2021. According to the adjudicatory order, Mother "neither admit[ted] nor denie[d] the allegations in the Petition, the [C]hildren being dependent and neglected, and underst[ood] that the Court [would] adopt the allegations in the Petition as findings of fact[.]" The court thereby adopted DCS's allegations of dependency and neglect as to Mother and also found the Children to be victims of severe child abuse, as defined by Tennessee Code Annotated § 37-1-102(b)(27), perpetrated by Mother.

Following several continuances and the trial court's finding that Father had "fail[ed] to appear or otherwise defend the removal of the [C]hildren" in a preliminary hearing, the trial court entered a default judgment on October 5, 2021, finding probable cause that the Children were dependent and neglected as to Father. Following a hearing during which Father appeared and stipulated to the allegations in the dependency and neglect petition, the trial court adjudicated the Children dependent and neglected as to Father in an order entered on December 21, 2021. Having reserved the issue of severe child abuse as to Father for a subsequent hearing, the court entered an order on April 4, 2022, finding the Children to be victims of severe child abuse perpetrated by Father and adopting the allegations in the dependency and neglect petition as findings of fact concerning Father.

On March 21, 2022, the trial court entered an agreed order divesting Paternal Grandparents of custody of the Children. Paternal Grandparents admitted that they had left the Children in the care of the parents, contrary to the court's prior order, and that while the Children were in the parents' care, an incident had occurred that resulted in the parents' arrest on criminal charges. According to the agreed order, the facts of that incident were as follows:

> On March 10, 2022, the U.S. Marshals Service informed [DCS] that it was at the home of the parents, [Mother] and [Father], who were being arrested.
>
> On said date, [the Children] were present in the home.
>
> The U.S. Marshals Service advised that [Mother] was holding Azelea and that [Mother] had a significant amount of heroin on her person.
>
> The U.S. Marshals Service further advised that syringes, burnt spoons, and other paraphernalia [were] located in the home within reach of [the Children].

(Paragraph numbering omitted.) In its March 2022 order, the trial court awarded custody of the Children to friends of the family, M.H. and R.H., as a "kinship placement."

The trial court subsequently entered an order on June 21, 2022, divesting M.H. and R.H. of custody upon finding that they were no longer able to serve as a placement for the Children. M.H. testified during the termination trial that this was due to health concerns for her husband, R.H. In the June 2022 order, the trial court awarded custody of the Children to DCS, and DCS then placed the Children in the care of their current foster parents ("Foster Parents").

DCS developed a family permanency plan on July 5, 2022, which the trial court ratified on July 18, 2022, and DCS presented as an exhibit at trial. Although their respective counsel participated in development of the plan, neither parent participated in its development. According to an affidavit executed by a DCS team leader, DCS sent a copy of the July 2022 permanency plan to each parent at the parents' last known address, which was the same for both parents. DCS staff noted in the plan that on March 23, 2022, Father was in jail with a four-million-dollar bond and that by the time of the plan's development, a *capias* warrant had been issued for Father based on his failure to appear in criminal court on pending charges. In its ratification order, the trial court found that neither parent had participated in the July 2022 plan's development and that the parents' whereabouts were unknown at that time.

A family permanency plan had previously been developed on July 13, 2021, through a child and family team meeting conducted when the Children were in Paternal Grandparents' custody. This initial plan indicates that Mother personally participated in the July 2021 child and family team meeting. Notes from the July 2021 team meeting indicated that Mother was a disabled military veteran receiving disability benefits and that Father had recently completed a cosmetology course. During the termination trial, Mother testified that she suffered from post-traumatic stress disorder ("PTSD") related to her time in the military and agoraphobia with panic and anxiety disorder.

The initial plan was reviewed in team meetings held on January 6, 2022, and April 12, 2022. Although counsel for both parents were present at each team meeting, it is not clear from the record whether Mother personally participated in the meetings reviewing the initial plan or whether Father personally participated at all in the child and family team meetings. The parents' responsibilities as set forth in the initial permanency plan, prior to the Children's placement in DCS custody, were consistent with those in the plan subsequently developed and ratified in July 2022 after the Children entered DCS custody.

Father and Mother shared essentially the same responsibilities in the permanency plans. These included: (1) resolving all pending and current criminal charges,

complying with all orders of the criminal court, refraining from incurring any new criminal charges, and informing DCS of any new charges or changes in status of past charges within seventy-two hours; (2) submitting to random and periodic urine and hair follicle drug and alcohol screens while not chemically altering or shaving hair throughout the pendency of the case, completing an alcohol and drug assessment and all resultant recommendations, informing DCS of any substance abuse relapses within seventy-two hours, refraining from association with known drug users, refraining from using Cannabidiol ("CBD") products, and signing any and all releases to allow DCS staff to speak with alcohol and drug treatment providers; (3) completing a psychological evaluation with participation in counseling or therapeutic treatment if recommended and allowing random and scheduled pill counts by DCS of any prescribed medications; (4) undergoing a clinical parenting assessment and completing resultant recommendations, completing parenting classes, and applying parenting skills learned to visits with the Children; (5) obtaining a legal means of income, providing DCS with verification of employment, completing a budget with a case manager, and informing DCS staff within seventy-two hours if employment were lost; (6) maintaining visitation with the Children, including arriving on time for visits and with items the Children might need during the visits; and (7) maintaining a safe and stable home for the Children and reporting any change in living conditions within seventy-two hours to DCS. In its order ratifying the July 2022 plan, the trial court found that "[t]he requirements set out in the plan [were] reasonable, related to remedying the conditions that necessitate[d] foster care, and in the best interest of the [C]hildren."

DCS filed its petition to terminate the parental rights of Father and Mother to the Children on August 16, 2022. DCS averred in the petition that since the Children came into protective custody, Mother had been incarcerated from May 7 to 8, 2022, in Putnam County, Tennessee, and Father had been incarcerated from March 10 to 18, 2022, and from April 18 to June 7, 2022, in Putnam County. According to DCS, Mother had been "incarcerated for offenses including, but not limited to, aggravated assault with a deadly weapon, possession with intent to sell hydrocodone, failure to appear, violation of probation, driving while license suspended, revoked, and/or cancelled, driving under the influence, and introduction of contraband into a penal institution." DCS averred that Father had been "incarcerated for offenses including, but not limited to, possession[,] manufacture and delivery, theft of services, failure to appear, possession of a weapon as a felon, violation of probation, possession of drug paraphernalia, violation of parole, and attempted introduction of contraband into a penal institution."

In the termination petition, DCS alleged statutory grounds against both Father and Mother of (1) abandonment by an incarcerated parent for failure to financially support the Children, (2) abandonment by wanton disregard prior to the parents' incarceration, (3) failure to substantially comply with the reasonable requirements of the permanency plans,

- 6 -

(4) persistence of the conditions leading to removal of the Children, (5) severe child abuse, and (6) failure to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children. DCS further alleged that it was in the Children's best interest for Father's and Mother's parental rights to be terminated. The trial court subsequently entered an order appointing counsel for each parent and again appointing Ms. Gurley as a GAL to represent the Children. Neither parent filed an answer to the petition.

DCS filed a motion to suspend the parents' visitation with the Children on October 31, 2022, alleging that suspension of visitation was in the Children's best interest because the parents had not "not completed any of the requirements" of the permanency plans and had not visited the Children since the Children entered foster care on June 20, 2022. Following a hearing during which the parents appeared, the trial court entered an order on November 21, 2022, granting DCS's motion to suspend the parents' visitation upon finding that the parents were "noncompliant" with the permanency plans and that it was in the Children's best interest to suspend visitation. The court directed that Mother's visitation would "remain suspended until she provide[d] three (3) results negative for illegal drugs and the tests shall be random, unscheduled, and the sample shall not be altered so as to disturb the results." Mother did not complete this requirement, and by the time of trial, neither parent had seen the Children for approximately eight months.

In a review hearing order, also entered on November 21, 2022, the trial court found that DCS had received "no verification" that Father or Mother had completed any of the plan requirements. The court further found that the parents had been "evading law enforcement until recently," that Mother had been charged in Putnam County with introduction of contraband into a penal facility, and that Father had been charged in Putnam County on multiple drug-related offenses. According to an arrest warrant for Mother presented as an exhibit during the termination trial, Mother had allegedly attempted "to pass a hypodermic needle and a container of a mix of heroin and fentanyl and meth to a prisoner upstairs" in the Putnam County Sheriff's Office Jail on May 7, 2022. Although not specified as the "prisoner upstairs" in Mother's arrest warrant, Father was a prisoner in the jail at the time and was subsequently charged with attempted introduction of contraband into a penal facility.

The trial court conducted a bench trial on February 3, 2023. At the beginning of trial, DCS counsel announced that DCS was proceeding on only three termination grounds for both parents: (1) severe child abuse, (2) failure to substantially comply with the reasonable requirements of the permanency plans, and (3) failure to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children. DCS presented testimony from April Walker, a DCS family support services worker who had worked with the family from July 2021 until the

Children were brought into DCS custody in June 2022; Jamesia Evans, a DCS family services worker who had worked with the family since June 2022; M.H., the kinship placement individual who, with her husband, had custody of the Children from March 2022 to June 2022; Aunt; and the Children's current foster mother ("Foster Mother"). Mother testified on her own behalf. Although Father appeared for trial, he did not testify.

At trial, DCS presented as exhibits, *inter alia*, the dependency and neglect and permanency plan records, criminal history records for each parent, and a January 2023 order entered by the White County Chancery Court ("chancery court"), terminating the parental rights of Father and Mother to Ayra upon a petition filed by Aunt and her husband. The chancery court's order indicated that both parents had appeared for the termination proceedings in Ayra's case and had "agreed with the termination of their parental rights as to [Ayra]." The chancery court had found clear and convincing evidence of two statutory grounds related to Ayra: severe child abuse and abandonment by failure to financially support the child. The chancery court had also found by clear and convincing evidence that it was in Ayra's best interest to terminate Father's and Mother's parental rights.

According to Ms. Evans's and Mother's respective testimonies at trial in the instant action, Mother had made no contact with DCS and had not responded to Ms. Evans's attempts to contact her for several months after Mother's May 2022 arrest on the contraband charge. Mother testified that she had relocated to Florida at that time to avoid the temptation to relapse with substance abuse. Mother further testified that while in Florida from approximately June to September 2022, she worked cleaning houses and attended Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. When asked if she had any documentation of her attendance at AA and NA meetings, Mother acknowledged that she did not. According to Mother, Father joined her in Florida after his release on bond from the Putnam County jail, and he had worked in Florida sporadically cutting hair. It is undisputed that in September 2022, law enforcement in Florida located the parents together, arresting Father on a warrant for failure to appear in Tennessee and transporting Father and Mother back to Tennessee. Upon the parents' return to Tennessee, Mother served approximately ten days in jail, and Father was incarcerated on felony charges. Ms. Evans testified that when the parents resurfaced in Tennessee, she met with each of them and explained the ratified permanency plan in detail.

Testimony demonstrated that approximately one month prior to trial, Mother had completed a session of intensive outpatient therapy ("IOP") for substance abuse. Mother testified that she was in an "aftercare" substance abuse program, but she presented no proof of her participation in aftercare. Mother continued to receive veteran's disability benefits although the amount had been reduced in the eighteen months since the

Children's removal.[1] Mother was residing with J.B., the Children's paternal grandfather ("Paternal Grandfather"), while Father was incarcerated. The paternal grandmother, B.B., had since passed away. Father remained incarcerated with pending felony charges at the time of the termination trial. Mother acknowledged that she had deposited some funds into Father's prison commissary account and that she had attempted to assist Paternal Grandfather in retaining criminal defense counsel for Father.

The trial court entered a final order on April 3, 2023, terminating Father's and Mother's parental rights to the Children. The court determined by clear and convincing evidence that DCS had proven the three statutory grounds pursued at trial. The court further found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the Children's best interest. Father and Mother each timely appealed.

## II. Issues Presented

Father presents three issues on appeal, which we have restated slightly as follows:

1.      Whether the trial court erred in determining by clear and convincing evidence that Father had failed to substantially comply with the responsibilities and requirements of the permanency plans.

2.      Whether the trial court erred in determining by clear and convincing evidence that Father had failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children.

3.      Whether the trial court erred in determining by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Children.

Mother presents one issue, which we have similarly restated as follows:

4.      Whether the trial court erred in determining by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children.

---

[1] Mother testified that she had initially received 100% disability, which had subsequently been reduced to 70% disability, providing her with $1,764.62 per month. She stated that she had filed a petition to reinstate her 100% disability benefits but that the petition was still pending.

On appeal, Father has not challenged the trial court's findings regarding the statutory ground of severe child abuse, and Mother has not challenged the court's findings regarding any of the statutory grounds. However, correctly noting that this Court must "review thoroughly the trial court's findings as to each ground for [parental rights] termination and as to whether termination is in the child's best interest," *see In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), DCS has presented an issue concerning all of the statutory grounds found by the trial court. We have particularized those issues not raised by the parents and restated them as follows:

5.    Whether the trial court erred in determining by clear and convincing evidence that Father had committed severe child abuse.

6.    Whether the trial court erred in determining by clear and convincing evidence that Mother had committed severe child abuse.

7.    Whether the trial court erred in determining by clear and convincing evidence that Mother had failed to substantially comply with the responsibilities and requirements of the permanency plans.

8.    Whether the trial court erred in determining by clear and convincing evidence that Mother had failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 507; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*,

92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

- 11 -

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Grounds for Termination of Father's and Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2023) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4 . . . .

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Father's and Mother's parental rights: (1) severe child abuse, (2) substantial noncompliance with the reasonable requirements of the permanency plans, and (3) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. We will address each statutory ground in turn.

## A. Severe Child Abuse

The trial court found clear and convincing evidence that both Father and Mother had committed severe child abuse. Regarding this ground for termination of parental rights, Tennessee Code Annotated § 36-1-113(g)(4) provides:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant to this action, Tennessee Code Annotated § 37-1-102(b)(27)(E) (Supp. 2023) defines "severe child abuse" as:

Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

As this Court has previously explained:

[A] parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004)). "The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights." *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011) (quoting *State Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

On October 5, 2021, following a hearing upon DCS's dependency and neglect petition as to Mother, the trial court entered an adjudicatory order finding the Children to be dependent and neglected as to Mother and finding that Mother had committed severe child abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(27)(E). On December 21, 2021, following hearings upon the dependency and neglect petition as to Father, the trial court entered an adjudicatory order finding the Children to be dependent and neglected as to Father. On April 4, 2022, the trial court entered a separate order finding that Father had committed severe child abuse.

In determining that this ground for termination of parental rights had been proven by clear and convincing evidence as to both parents, the trial court expressly relied on its previous findings in the October 2021 order regarding Mother and the April 2022 order

regarding Father during the dependency and neglect proceedings. The trial court also relied on the chancery court's January 2023 order terminating Father's and Mother's parental rights to Ayra, their elder daughter, based in part on a finding that both parents had committed severe child abuse. On appeal, DCS maintains and Father concedes that these prior orders constituted *res judicata* on the issue of severe child abuse as to both parents.[2] We agree.

Tennessee Code Annotated § 36-1-113(g)(4) allows a trial court to terminate a parent's rights on the ground of severe child abuse if the parent "has been found to have committed severe child abuse, as defined in § 37-1-102, <u>under any prior order of a court</u>" (emphasis added). It is well settled that a trial court may rely on a prior court order finding severe child abuse and is not required to relitigate the issue of severe abuse at the trial to terminate parental rights. *See In re Samaria S.*, 347 S.W.3d at 201; *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). As this Court concluded in a comparable situation:

> Because Mother did not appeal the trial court's finding of severe child abuse within the time allowed by law, the order became a final order and the finding of severe child abuse is *res judicata.* Thus, the trial court did not err in finding that Mother has committed severe abuse for purposes of terminating her parental rights.

*In re Serenity S.*, No. W2014-00080-COA-R3-PT, 2014 WL 6612571, at *6 (Tenn. Ct. App. Nov. 24, 2014). We therefore affirm the trial court's determination that this statutory ground for termination was proven as to both parents by clear and convincing evidence.

### B. Substantial Noncompliance with Permanency Plans

The trial court found by clear and convincing evidence that Father and Mother had failed to substantially comply with the statement of responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

---

[2] On appeal, Mother has not addressed the trial court's findings as to any of the statutory grounds for termination of her parental rights aside from including them in a factual and procedural summary.

The trial court also expressly found that the requirements of the permanency plans were reasonable and related to the conditions necessitating foster care. *See* Tenn. Code Ann. § 37-2-403(a)(2)(C) (Supp. 2023) (providing in part that "the requirements of the statement" of responsibilities must be "reasonable" and "related to remedying the conditions that necessitate foster care placement"); *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (holding that a finding concerning whether permanency plan requirements are reasonably related to the conditions necessitating foster care "must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2)."). We note that the July 2022 permanency plan was the only one developed while the Children were in DCS custody and was thus the only one ratified by the trial court. However, during the termination trial, DCS presented three child and family team meeting summaries indicating that a family permanency plan had been developed in July 2021, while the Children were in Paternal Grandparents' custody, and subsequently reviewed twice and renewed during team meetings. The July 2021 and July 2022 plans included essentially the same set of responsibilities for the parents. Neither parent disputes the reasonableness of the plan requirements.

In its final judgment, the trial court detailed specific findings of fact concerning the parents' failure to substantially comply with the requirements of the permanency plans and what the court found to be DCS's reasonable efforts to assist Father and Mother with compliance:

> The Court finds by clear and convincing evidence that [] [Mother] and [Father] are in substantial noncompliance with the statements of responsibilities in the permanency plans in that the Court ratified the permanency plans and found them to be reasonable, necessary, and in the best interest of the [C]hildren; that the permanency plans clearly identify in writing the statements of responsibilities for [Mother] and [Father]; that the requirements in the permanency plans were all reasonably related to remedying the conditions that necessitate foster care; that there is little likelihood that [Mother] and [Father] will complete the plans in the near future; and that [Mother] and [Father] were provided with the Criteria and Procedure for Termination of Parental Rights advising them that substantial noncompliance with the permanency plans was a ground for termination of parental rights.

> April Walker, a family support services worker with [DCS], testified that she worked with [Mother] and [Father] for almost [] one (1) year from July, 2021, through June, 2022. During that time, a total of four (4) permanency plans were developed, all having basically the same action steps and statements of responsibilities for [Mother] and [Father].

The requirements of the plans included the following:

a)      the parents resolve their pending criminal charges;

b)      the parents adequately address their substance abuse issues;

c)      the parents complete mental health and psychological evaluations;

d)      the parents complete parenting assessments, parenting education, and demonstrate skills that they have learned;

e)      the parents have a legal means of income; and

f)      the parents maintain a bond with the [C]hildren.

During the period of time that Ms. Walker worked with [Mother] and [Father], no steps on the permanency plans were completed. [Mother] and [Father] failed to maintain consistent contact with the [C]hildren, failed to support the [C]hildren financially, did not take advantage of services offered by [DCS], and were nonresponsive to attempts to contact them.

Ms. Walker testified that she had attempted home visits, attempted text messages and emails, and tried to make weekly contact but [Mother] and [Father] failed to do their part to maintain contact with [DCS].

Jamesia Evans, a family services worker with the [DCS], has worked with [Mother] and [Father] since June, 2022. The record reflects that the permanency plan dated July 5, 2022, was ratified by the Court on July 18, 2022. Ms. Evans testified that [Mother] and [Father] have not completed their permanency requirements in that plan. In fact, the only action step completed was that [Mother] enrolled in an intensive outpatient program in November, 2022, and completed it, or some of it on December 29, 2022. However, at the time of the filing of the Petition on August 16, 2022, [Mother] had not completed any of the action steps. It was not until two (2) or three (3) months after the Petition was filed that [Mother] took any action in that regard.

[Mother] has not completed a psychological evaluation. Although she did participate in some parenting classes with Omni Visions, [Mother]

- 16 -

has not completed a parenting assessment. [Mother] and [Father] are still unable to demonstrate that they can provide for the [C]hildren physically and emotionally, and are still unable to demonstrate that they can provide a stable household.

Therefore, pursuant to Tenn. Code Ann. § 36-1-113(g)(2), the Court finds by clear and convincing evidence that [Mother] and [Father] are in substantial noncompliance with the statement of responsibilities in permanency plans.

(Paragraph numbering omitted.) Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings that Father and Mother failed to substantially comply with the reasonable responsibilities of their permanency plans.

In summarizing the parents' responsibilities under the permanency plans, the trial court listed six main requirements for the parents. For some of these six requirements, the plans also delineated more particular responsibilities, which were all essentially identical for Father and Mother. The parents were required to:

(1)     Resolve all pending criminal charges, to include: complying with all orders of the criminal court, refraining from incurring any new criminal charges, and informing DCS of any new charges or changes in status of past charges within seventy-two hours;

(2)     Adequately address their substance abuse issues, to include: submitting to random and periodic urine and hair follicle drug and alcohol screens while not chemically altering or shaving hair throughout the pendency of the case, completing an alcohol and drug assessment and all resultant recommendations, informing DCS of any substance abuse relapses within seventy-two hours, refraining from association with known drug users, refraining from using CBD products, and signing any and all releases to allow DCS staff to speak with alcohol and drug treatment providers;

(3)     Complete mental health and psychological evaluations, to include: participating in counseling or therapeutic treatment if recommended and allowing random and scheduled pill counts by DCS of any prescribed medications;

(4)     Complete parenting assessments, parenting education, and demonstrate skills learned;

(5)     Obtain and maintain a legal means of income, to include: providing DCS with verification of employment, completing a budget with a case manager, and informing DCS staff within seventy-two hours if employment were lost; and

(6)     Maintain a bond with the Children, to include: maintaining visitation with the Children, arriving on time for visits, and bringing items the Children might need during the visits.

Additionally, the permanency plans included a seventh overall requirement that the parents maintain a safe and stable home for the Children and report any change in living conditions to DCS within seventy-two hours.[3]  We will address the trial court's findings as to each parent in turn.

## 1. Father

On appeal, Father acknowledges that he did not "complete[] the plan fully."  He argues that he "substantially complied with the most important parts of the permanency plan in that he became sober and was regularly visiting the Children."  In support of his argument, Father relies on Ms. Walker's testimony that Father had passed every drug screen she had administered to him, Aunt's testimony that Father had passed a nail bed drug screen at some point during the pendency of the case involving Arya, and Father's visits with the Children prior to their coming into DCS custody in June 2022.  DCS responds that Father failed to adequately address his substance abuse issues, maintain a bond with the Children, or substantially comply with the other requirements of the permanency plans.  We agree with DCS on this issue.

Ms. Walker was the family's case manager from July 2021 to June 2022.  Ms. Walker testified that she administered multiple drug screens to the parents while she was the case manager and that they passed each one.  However, Ms. Walker further testified that although she "would try to do at least monthly drug screens," "[t]here were times when [she] couldn't find the parents, couldn't reach the parents."  Ms. Walker stated that she did not know exactly how many drug screens she administered to the parents.

---

[3] The permanency plans also included a responsibility for both parents to pay child support as set through the Tennessee Child Support Division.  However, although it is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place, *see* Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2023), it is undisputed that no order was entered setting a child support obligation amount for either parent.

According to Ms. Walker, the parents made "very little contact" with DCS during the months of December 2021 and January 2022 particularly.

Additionally, Father's criminal history belies his position that he had demonstrated a resolution of his substance abuse during this time. In March 2022, the parents were arrested following the U.S. Marshals' raid at their home, and illegal drugs and drug paraphernalia were found in the home at that time. Additionally, Father was charged in May 2022 with attempted introduction of contraband into a penal facility after Mother allegedly attempted to pass a mix of heroin, fentanyl and methamphetamine, as well as drug paraphernalia, to him. Concerning Aunt's testimony regarding the nail bed drug screen, Aunt did not specify when the screen was performed and reported that it was during the pendency of Ayra's placement in protective custody. No documentation of this nail bed drug screen is in the record before us.

As to the time period following the Children's placement in DCS custody in June 2022 and the termination petition's filing in August 2022, it is undisputed that Father, while out of jail on bond, relocated to Florida to join Mother there without notifying DCS. Ms. Evans, who served as the family's case manager beginning in June 2022, testified that she could not locate the parents until police officers returned them to Tennessee in September 2022 after Father was arrested in Florida and extradited to Tennessee. At the time of trial, Father had been incarcerated since September 2022 and had not presented any proof of participation in substance abuse treatment. Ms. Evans's testimony and Father's criminal history demonstrated that he had seven pending felony charges and one pending misdemeanor charge.

Father also asserts that his visits with the Children during the time that they were in Paternal Grandparents' custody and M.H. and R.H.'s custody demonstrate that he was in substantial compliance with the permanency plans. Ms. Walker testified that Father and Mother visited the Children regularly "[f]or the most part" while the Children were in Paternal Grandparents' custody. However, as Ms. Walker pointed out, Paternal Grandparents lost custody when they allowed the parents to care for the Children unsupervised and the incident with the U.S. Marshals occurred in March 2022.

M.H. testified that during the approximately two months that she and R.H. had custody of the Children, the parents visited but that the visits were "seldom." M.H. reported that Father and Mother were "nodding off" during visits and would spend a significant amount of time in the bathroom one at a time. M.H. suspected that the parents were under the influence of drugs during visits. M.H. acknowledged that her husband had asked the parents to visit at night to help put the Children to bed. However, she stated that Father and Mother would appear "four or five hours later, maybe eight hours later" than scheduled, at midnight or later, after the Children were already in bed. M.H.

further testified that Mother visited the Children approximately four times while they were in M.H.'s custody but that Father was incarcerated some of that time and did not participate in all of the visits.

Father's argument that he substantially complied with the permanency plans by addressing his substance abuse issues and maintaining a bond with the Children is unavailing. It is undisputed that by the time of trial, neither parent had seen the Children in approximately eight months, and Father's instances of negative drug screens were punctuated by incidents when he was arrested or simply could not be found to screen. Moreover, Father presented no proof that he had addressed the other requirements of the permanency plans, including resolving criminal charges, undergoing mental health and psychological evaluations, completing parenting assessments, maintaining a legal source of income, and providing a safe and stable home. Instead, Father accrued more criminal charges, and as the trial court found, Father completed no steps of the permanency plans. We conclude that the trial court did not err in terminating Father's parental rights based upon clear and convincing evidence of this statutory ground.

## 2. Mother

Mother does not address this statutory ground directly on appeal. However, in support of her argument that it was not in the Children's best interest for her rights to be terminated, Mother asserts that although she showed a "lack of progress" on the permanency plan requirements in the past, she had demonstrated her "current sobriety and willingness to work the plan now" by the time of trial. Mother points to her completion of an IOP program and negative urine drug screen in December 2022. Mother testified at trial that she "want[ed] time to finish [her] plan" in order to prove that she "deserve[d]" to have the Children returned to her. Mother also posits that at the time of trial, she had demonstrated a safe and secure living situation because her testimony indicated that she was residing with Paternal Grandfather in his home.

As the trial court found, the "only action step completed" by Mother was her enrollment in and completion of the IOP program. Ms. Evans testified that after the parents' return to Tennessee from Florida in September 2022, Mother enrolled in the IOP program in November 2022, and completed the program on December 29, 2022. However, as the court noted, Mother had not completed any action steps from the permanency plans at the time of the termination petition's filing in August 2022.

Mother testified that the largest obstacle to her completing her requirements was a lack of transportation due to the suspension of her driver's license. She acknowledged that she owned a vehicle but stated that she needed to pay approximately $200 in fines, obtain insurance, and have an interlock device installed in her car in order to have her

license reinstated. Mother also acknowledged that the reason for the interlock device was a prior conviction of driving under the influence. At the time of trial, Mother was receiving approximately $1,764 per month in veteran's disability benefits. As Mother admitted, she had paid funds toward Father's commissary account in prison and had attempted to assist Paternal Grandfather in paying to retain an attorney for Father's criminal defense. Mother's testimony demonstrated that she knew the steps she needed to take to secure transportation and had at least some resources to take those steps but had not taken them.

As to Mother's living situation in Paternal Grandfather's home at the time of trial, the court found in a subsequent section of its final order that Paternal Grandfather had "basically ignored the Order of the Court and allowed the children to remain unsupervised with [Mother] and [Father] when they were in possession of illegal drugs." The court did not find Mother's residency in Paternal Grandfather's home to be a safe and secure living situation for the Children, and the evidence does not preponderate against this finding.

We determine that the trial court did not err in finding that Mother had completed none of the responsibilities of the permanency plans prior to the termination petition's filing. Furthermore, Mother's efforts after the termination petition's filing were "too little, too late" to demonstrate substantial compliance. *See, e.g.*, *In re A.W.*, 114 S.W.3d 541, 544-47 (Tenn. Ct. App. 2003) (affirming the trial court's finding that the parent's improvements made since the filing of the termination petition were "'too little, too late.'"). We conclude that the trial court did not err in terminating Mother's parental rights upon clear and convincing evidence of the statutory ground of failure to substantially comply with the reasonable requirements of the permanency plans.

### C. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Children

The trial court also found clear and convincing evidence to support termination of Father's and Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2023), which provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Our Supreme Court has explained the following with regard to this ground for termination of parental rights:

Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

As to the first prong, our Supreme Court has held:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677. Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In its final judgment, the trial court set forth the following specific findings of fact regarding this statutory ground as to both parents:

The Court finds by clear and convincing evidence that [Mother] and [Father] have failed to manifest, by act or omission, a willingness and ability to personally assume legal and physical custody and financial responsibility of the [C]hildren and that placing the [C]hildren in the legal and physical custody of [Mother] and [Father] would pose a risk of substantial harm to the physical or psychological welfare of the [C]hildren.

The Court finds that at some point during the underlying case [Mother] left Tennessee. [Mother] only came back after being picked up by law enforcement for a failure to appear on criminal charges that she has pending in Tennessee. [Father] has either been on the run evading law enforcement or in jail since Ms. Evans has been assigned the case. [Mother] and [Father] have felony charges pending, including charges that [Mother] incurred as a result of attempting to bring drugs into jail to give to [Father]. [Mother] and [Father] have another child, Ayra, who is in the custody of [Mother's] sister. As set forth in [DCS's] Exhibit 27, the parental rights of [Mother] and [Father] to Arya have been terminated. Ms. Evans testified that [Mother] and [Father] have failed to maintain contact. Ms. Walker and Ms. Evans each testified that the Department made attempts to contact [Mother] and [Father] but they did not respond. Ms. Evans further testified that she had sent three (3) certified letters to three (3) different addresses, made several attempts to contact [Mother] and [Father], and went to the address where [Father] had been living with his parents, all to no avail.

Ms. Evans also testified that she had attempted to drug screen [Mother] and one (1) test was negative. However, on another attempt, it is apparent to the Court that [Mother] attempted to alter the test because the clear liquid and temperature reading was not consistent with someone giving a true sample.

Additionally, the record provides that [Mother] and [Father] have not supported the children financially.

[Mother] and [Father] have not visited the [C]hildren in over eight (8) months. [Mother] and [Father] have not done much of anything to maintain a bond with the [C]hildren. [Mother] and [Father] also left Tennessee for eight (8) months and did not have any contact with the [C]hildren at all. [M.H.], the [C]hildren's former kinship placement, testified that during the time she served as a caregiver, visits by [Mother] and [Father] were inconsistent. There were times when [Mother] and

- 23 -

[Father] would show up and it appeared to [M.H.] that they were under the influence. [Mother] and [Father] would nod off during the visits. [Mother] and [Father] would tell [M.H.] that they wanted to come help her or [M.H.] would ask them for help getting the [C]hildren ready for bed. [Mother] and [Father] would not show up until midnight or 2:00 AM, after the [C]hildren were already in bed. During some of those times, [M.H.] testified that [Mother] and [Father] appeared to be under the influence.

[M.H.] further testified that she had observed the [C]hildren with the current [Foster Parents]. [M.H.] testified that she believes the [C]hildren are where they belong and are well cared for. [Mother's] sister, [Aunt], testified that the [C]hildren are very bonded with [Foster Parents]. [Aunt] testified that she has a close personal relationship with [Foster Parents] and they have a history of maintaining contact with each other so the [C]hildren can visit and have contact with Ayra, their sibling. [Aunt] testified that she anticipates that relationship will continue in the future so there will be a relationship between the siblings. [Foster Mother] testified that she has a strong bond with the [C]hildren. It is obvious to the Court that [Foster Mother] cares deeply, loves the [C]hildren, and is committed to adopting them. The Court is convinced that [Foster Parents] are able to provide the [C]hildren with security, structure, and a loving home.

[Aunt] also testified that she is [Mother's] sister and is aware that [Mother] has struggled with substance abuse for the past twenty (20) years. [Aunt] testified that she is further aware that [Father] has had substance abuse issues for at least seven (7) to ten (10) years.

[Mother] testified that she left Tennessee because she was in fear of relapsing. When she was questioned about the incident concerning her attempt to sneak drugs to [Father] in jail, she [pled] "the Fifth" and the Court takes a negative inference from that. [Mother] admitted to using drugs while she was pregnant with the [C]hildren. [Mother] also admitted that she has not paid child support.

The Court understands that [Mother] is a veteran of the armed forces and it appreciates her service. [Mother] admitted that she suffers from post-traumatic stress disorder as a result of her service. The Court understands that [Mother] has been determined to be at least partially disabled by Veterans Affairs and receives approximately $1,700 a month in benefits. However, no proof was presented that [Mother] has done anything to address her mental health issues. [Mother] admitted that she still suffers

from mental health problems including anxiety attacks but has not done anything to address it, which is very concerning to the Court.

Another issue that concerns the Court is that although [Mother] is receiving $1,700 a month, she admitted that she has been putting money on [Father's] commissary in jail but not providing any support to the [C]hildren, including in-kind support such as diapers, food, snacks, etc. [Mother] has the means and ability to at least provide some in-kind support for the [C]hildren but has not done anything. The testimony provided that [Mother] bought Christmas presents but refused to give them to the [C]hildren. [Mother] reported that . . . she was going to keep the presents until the [C]hildren came home, knowing that is an unrealistic possibility given the fact that she has essentially not done anything to complete the steps on the permanency plans. This is a very selfish act by [Mother] who appears to be more concerned about [Father] and his legal issues than doing what she needs to do to parent the [C]hildren, and the Court finds this very concerning.

As to [Mother's] leaving Tennessee for several months, it is important to note that the only reason she came back was because she was picked up for failing to appear at one of her court dates here. The Court is not sure that [Mother] would have ever returned to Tennessee or done anything to work on the permanency plans if not for her arrest.

As it stands today, [Mother] and [Father] continue to have criminal charges pending. One of the requirements of the permanency plans was that [Mother] and [Father] resolve pending criminal charges. The charges are not resolved. Based upon the actions of [Mother] and [Father], it appears that they are not doing anything to try to resolve their charges. This is based upon the fact that [Mother] had a court date and failed to appear resulting in her arrest. There was also testimony presented that [Father] had made bond. The Court thinks it was around $600,000. [Father] skipped out on his bail and had to be picked up again. In all, [Mother] and [Father] are just making resolution of their criminal charges more difficult.

[Mother] testified that she hopes, plans on, or has applied to participate in the Veterans Recovery Court. The Court finds that would be wonderful for [Mother] and it hopes she pursues it.

In addition, [Father] remains incarcerated. [Mother] is still living in the home with the paternal grandfather. This is the same home where the paternal grandfather basically ignored the Order of the Court and allowed the [C]hildren to remain unsupervised with [Mother] and [Father] when they were in possession of illegal drugs. The Court does not find that either [Mother] or [Father] have a suitable home nor are they able at this time to care for the [C]hildren and provide for them.

[Mother] and [Father] are in substantial noncompliance with their statements of responsibilities in the permanency plans. The [C]hildren as well as Ayra have been determined to be the victims of severe child abuse perpetrated by [Mother] and/or [Father].

For all of these reasons, the Court finds that [Mother] and [Father] have not demonstrated a willingness or an ability to assume custody or financial responsibility for the [C]hildren and that placing the [C]hildren with [Mother] and [Father] would pose a risk of substantial harm to the [C]hildren. The Court finds the proof is overwhelming with respect to this ground.

(Paragraph numbering omitted.) Upon thorough review of the record, we determine that the evidence preponderates in favor the trial court's findings. We will address the court's findings as to each parent in turn.

## 1. Father

Father acknowledges that because he was incarcerated at the time of trial, placing the Children with him would have posed a risk of substantial harm to the Children. Father thereby concedes that DCS proved the second prong of this statutory ground by clear and convincing evidence. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018) ("[P]lacing a child with a parent who [has] knowingly engaged 'in repeated criminal conduct that necessitated [the parent's] re-incarceration' would place the child at risk of physical or psychological harm." (quoting *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018))). However, Father argues that DCS failed to prove the first prong of this ground. He maintains that because he purportedly passed a nail bed drug screen and "multiple other drug screens" and "visit[ed] regularly with the [C]hildren in the beginning of the case," he manifested an ability and willingness to assume custody of the Children. We find Father's argument unavailing.

In its findings concerning this ground, the trial court focused on Father's failure to resolve his criminal charges, accrual of additional criminal charges after the Children were brought into protective custody, and absence from Tennessee when he "skipped out on his bail" in the spring of 2022 and relocated to Florida for several months without staying in contact with DCS or the Children. Father's argument that he passed drug screens and visited the Children focuses solely on the months prior to Father's disappearance from Tennessee. As explained in the previous section of this Opinion, the negative nail bed drug test occurred, according to Ms. Walker's testimony, at some point during the pendency of the case involving Ayra, and no documentation of that nail bed test is in the record for the instant action.

Furthermore, Ms. Walker testified that there were times during the pendency of this action when she could not find the parents or reach the parents to administer drug tests. Ms. Evans testified that she was unable to administer drug tests to Father because he was out of state and out of contact when she took over the case in June 2022 and because Father was incarcerated once he was extradited from Florida to Tennessee in September 2022. As Father avers, his visitation with the Children was consistent while the Children were in Paternal Grandparents' custody. However, it was also during this time period that the U.S. Marshals' raid occurred in March 2022, revealing that the parents had violated the trial court's order by having the Children with them without supervision and that the parents had endangered the Children by placing them in the presence of illegal drugs. As the trial court found, Father incurred additional barriers to completing the requirements of his permanency plans and regaining custody of the Children rather than bringing himself closer to doing so.

Moreover, Father clearly did not manifest an ability and willingness to assume financial responsibility for the Children. Father completed a course in cosmetology at some point prior to the July 2021 child and family team meeting, and Mother testified that Father had earned some funds cutting hair in Florida during the summer of 2022. Nonetheless, undisputed testimony at trial demonstrated that Father had paid no child support for the Children and provided no in-kind support (such as clothes, toys, or food) to the Children during the pendency of this case.

The evidence does not preponderate against the trial court's findings that Father failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children and that placing the Children in Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Father's parental rights.

## 2. Mother

Although Mother does not directly address this statutory ground, within her best interest argument, Mother maintains that at the time of trial, she had demonstrated her sobriety since returning to Tennessee with the completion of her IOP in December 2022, her ability to financially support the Children with her disability income, and her "ideal housing" situation with Paternal Grandfather. Citing her own testimony regarding transportation, Mother asserts that she "was close to getting" her driver's license reinstated at the time of trial so that she would no longer have to rely on others for transportation and could remove that obstacle from her efforts to complete permanency plan requirements. In averring that she would now "be able to complete the requirements on her permanency plan quickly," Mother implicitly acknowledges that at the time of trial, and certainly at the time of the petition's filing, she was not ready to assume custody of or financial responsibility for the Children.

Concerning the first prong of this statutory ground, whether Mother had manifested an ability and willingness to assume custody or financial responsibility, the trial court found that, like Father, Mother had incurred new criminal, drug-related charges rather than resolving existing ones since the Children were brought into protective custody. The court particularly noted Mother's testimony that she would have stayed in Florida if Father had not been extradited in September 2022. Mother stated that she had spoken to a lawyer in Florida and that she would have retained counsel and would have been "fighting for [her] kids" from Florida. However, the evidence indicated that Mother stayed in Florida for several months without contacting DCS even though DCS, as Ms. Evans testified, was the parents' link to maintaining contact with the Children once the Children were brought into DCS custody and Foster Parents' care.

The trial court encouraged Mother in her expressed plan to explore the "Veterans Recovery Court" program, but Mother had not yet pursued this at the time of trial, and she had criminal charges pending. Although Mother testified that she had participated in AA and NA while in Florida and that she was participating in aftercare after finishing her IOP in Tennessee, she presented no documentation of AA, NA, or aftercare participation. After the Children were removed from her custody, Mother was allegedly found with heroin on her person while holding Azelea in March 2022 and allegedly attempted to pass illegal drugs to Father while he was incarcerated in May 2022. Furthermore, Mother acknowledged her mental health concerns, testifying that she suffered from PTSD and agoraphobia with panic and anxiety disorder. Yet, as the trial court found, Mother presented "no proof" that she had "done anything to address her mental health issues."

Although Mother characterizes her living situation in Paternal Grandfather's home as "ideal," the trial court determined it to be an unsuitable home for the Children. The

court noted Paternal Grandfather's history of ignoring the trial court's order requiring supervision of the parents' visitation, particularly noting that the parents were found with illegal drugs while alone with the Children after Paternal Grandparents allowed them an unsupervised visit. The court considered Mother's veteran's disability income but found that Mother had not manifested the willingness to prioritize spending funds on the Children over Father's needs while in prison. The evidence preponderates in favor of the court's findings that Mother failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children.

Regarding prong two, the risk of substantial harm to the Children if they were to be placed with Mother, the trial court found, in addition to concerns related to Mother's drug use and criminal charges, that after the Children were removed from Paternal Grandparents' custody, Mother failed to maintain a meaningful relationship with the Children. M.H. testified that the parents' visits with the Children were inconsistent, that the parents would often appear late at night after the Children were in bed, and that she suspected the parents were under the influence of drugs during visits. By the time of trial, the Children had not seen the parents in eight months. Ms. Evans testified that the Children did "not know who Father and Mother [were]." The trial court found that the testimonies of several witnesses, including Ms. Evans, M.H., Aunt, and Foster Mother, demonstrated that the Children were strongly bonded to Foster Parents. Moreover, Mother's history of drug use to the point of perpetrating severe child abuse by exposing the Children and Ayra to drugs *in utero*, the Children's continued exposure to illegal drugs as illustrated by the U.S. Marshals' raid in March 2022, and the parents' repeated accrual of drug-related criminal charges support the trial court's finding that the Children would be at risk of substantial harm if placed in Mother's custody.

The trial court found the proof concerning this statutory ground to be "overwhelming," and we agree. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Mother's parental rights as well.

## V.  Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental

rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (Supp. 2023) lists the following factors for consideration:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)    Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)    Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)    Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)    Whether the child is fearful of living in the parent's home;

(G)    Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)    Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)    Whether the physical environment of the parent's home is healthy and safe for the child;

(S)    Whether the parent has consistently provided more than token financial support for the child; and

(T)    Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

Under the previous statutory scheme utilizing nine similar best interest factors, our Supreme Court instructed regarding the best interest analysis as a whole:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of

- 32 -

statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court made detailed findings regarding the best interest factors and concluded that, with the exception of two factors for which the court made no specific findings regarding either parent and one factor for which the court made no findings regarding Father, all factors weighed in favor of terminating Father's and Mother's parental rights to the Children. Upon our thorough review of the evidence presented, we conclude that clear and convincing evidence established that termination of Father's and Mother's parental rights was in the Children's best interest. Given the similarity of the trial court's analysis as to Father and Mother, we will address application of the best interest factors to both parents simultaneously, noting distinctions when needed.

Factors (A), (C), and (J) are related by reason of their emphasis on the Children's stability and safety. The trial court determined that factor (A) weighed in favor of termination because it would "have a positive impact on the [C]hildren's critical need for stability and continuity of placement throughout the [C]hildren's minority." The court found that the Children were "in a good foster home where they [were] well cared for by pre-adoptive foster parents who [were] committed to them." Relatedly, concerning factor (C), the court found that Father and Mother had "not demonstrated continuity and stability in meeting the [C]hildren's basic material, educational, housing, and safety needs." In determining that factor (C) weighed in favor of termination, the court particularly noted Father's incarceration, Mother's pending criminal charges, Mother's

living situation in the home of Paternal Grandfather, and the recent termination of parental rights to the Children's sister, Ayra.

Regarding factor (J), whether the parent had demonstrated a lasting adjustment, the court considered its findings that both parents were in substantial noncompliance with the permanency plans and that both had failed to demonstrate the ability and willingness to assume custody or financial responsibility to conclude that the parents had "failed to demonstrate a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the [C]hildren to be in the home with either of them." The evidence presented supports the trial court's findings regarding these statutory factors.

Pertaining to factor (B), the trial court determined that this factor weighed in favor of termination because "a change in caregiver and physical environment [was] likely to have a negative impact on the [C]hildren's emotional, psychological, and/or medical condition." The court found that the parents had "failed to complete services offered by [DCS], failed to maintain regular visitation, and failed to support the [C]hildren." In contrast, the court found that with Foster Parents, the Children were "in the best place for them right now." The evidence preponderates in favor of these findings. Testimony from Ms. Evans, M.H., Aunt, and Foster Mother demonstrated that the Children were bonded to Foster Parents and thought of them as their parents. Aunt, who had custody of Ayra, testified that Foster Parents had taken care to include Ayra in events such as birthday parties with the Children. M.H. testified that the Children were "exactly where they need[ed] to be" with Foster Parents.

Although she does not address specific best interest factors on appeal, Mother contends that by the time of trial, she had established an "ideal" living situation in Paternal Grandfather's home. However, the trial court found that Paternal Grandfather's home was not a safe and stable situation for the Children due to Paternal Grandfather's history of ignoring the court's prior order regarding supervision of the parents with the Children. The court also noted that the U.S. Marshals' March 2022 raid, wherein drugs were found with the parents and the Children together, occurred while the Children were in Paternal Grandparents' custody. For his part, Father acknowledges on appeal that "some of the [best interest] factors do weigh against" maintaining his parental rights without specifying which factors. Father does concede in an earlier section of his argument that due to his incarceration, placing the Children with him at the time of trial would have placed the Children at risk of substantial harm.

Regarding factor (B), we conclude that returning the Children to either parent would have rendered a deleterious effect on the Children's well-being. Additionally, the trial court found as to factor (R), concerning the physical environment of a parent's home, that Mother's home was "unhealthy and unsafe" for the Children and that Father

was incarcerated. Considering that Mother relied on her living situation with Paternal Grandfather and presented no other evidence of a healthy and safe physical environment, we determine that the evidence also preponderates in favor of this finding.

Factors (D), (E), (H), and (I) are related due to their emphasis on parental attachments and relationships. With respect to factor (D), the trial court found that the parents did "not have a secure and healthy parental attachment with the [C]hildren" and that there was no "reasonable expectation" that the parents would develop such an attachment. As to factor (E) and the parents' visitation with the Children, the court found that the parents had "not maintained regular visitation or other contact with the [C]hildren or used it to cultivate a positive relationship with the [C]hildren." Particularly concerning Mother after her return from Florida, the court found that although Mother had expressed a desire to resume visits with the Children, she had failed to comply with the court's order requiring that she pass three unannounced drug screens before resuming visitation.

In relation to the above factors concerning parental attachments, Father argues on appeal that termination of his parental rights is not in the Children's best interest because (1) Mother testified that Father had a bond with the Children, (2) Father (and Mother) visited the Children regularly before they came into DCS custody, and (3) Ms. Walker and Ms. Evans each respectively testified that Father asked about the Children and expressed concern about them while he was incarcerated. Father's argument fails to take into account his complete absence from these very young Children's lives for eight months prior to the time of trial, as well as what the trial court found to be the problematic nature of the parents' visits with the Children in earlier months. Although Father's expressions of concern for the Children to DCS case workers do him credit, they are "too little, too late" to demonstrate a secure and healthy parental attachment with the Children. *See In re A.W.*, 114 S.W.3d at 544-47.

Concerning factor (H), the trial court found that the Children had "created a healthy parental attachment with [Foster Parents] in the absence of [Mother] and [Father]" and credited Foster Mother's testimony that she had "a strong bond" with the Children and was "committed to adopting them." Likewise, regarding factor (I), the court determined that the Children had "a bond and relationship with their older sibling, Arya, because of the foster parents' relationship with Arya's custodians." The court stated that it was "satisfied that [the] relationship will continue so that Arya and the [C]hildren will be able to maintain a relationship with each other if the parental rights of [Mother] and [Father] are terminated." The evidence preponderates in favor of the court's findings as to factors (D), (E), (H), and (I), and we agree with the trial court's decision to weigh these factors in favor of terminating Father's and Mother's parental rights to the Children.

Factors (F) and (G) relate to the Children's previous experiences in the parents' home and any trauma resulting from those experiences. The trial court expressly made "no specific finding(s)" concerning whether the Children were fearful of living with the parents (factor F) or whether Father's or Mother's home would trigger or exacerbate the Children's trauma (factor G). Although the court did not state its rationale for apparently finding these factors to be inapplicable, we note that the Children came into the protective custody of the court while they were still hospitalized as newborn infants and that they were then placed with Paternal Grandparents. If the Children had any experience of the parents' home, the record indicates that it would have been when the Children were present at the parents' home during the March 2022 U.S. Marshals' raid. We recognize that the record contains no evidence of trauma suffered by the Children during this raid although we believe that some resulting trauma could certainly be inferred. Given the Children's young age when they may have had any limited experience of the parents' home and Ms. Evans's testimony that the Children did not know who Father and Mother were at the time of trial, we conclude that factors (F) and (G) weigh neither for nor against termination.

Factors (K) and (L) both concern services and assistance offered to the parents. With respect to factor (K), the trial court found that Mother and Father "failed to take advantage of available programs, services, and community resources to assist them in making a lasting adjustment of conduct, circumstances, or conditions." The court noted its earlier findings that Mother "did not complete any of the permanency requirements prior to the Petition being filed" and that Father had "still not completed any of the requirements." The court thereby weighed factor (K) in favor of termination. On appeal, Mother highlights her completion of an IOP in December 2022, several months after the petition's filing. Although this progress indicated that Mother had begun to take advantage of a resource to combat her substance abuse by the time of trial, she did not present evidence of any action taken prior to the petition's filing or any evidence of a lasting adjustment.

The court also weighed factor (L) in favor of termination, finding that DCS had "made reasonable efforts to assist [Mother] and [Father] in making a lasting adjustment of circumstances." Particularly as to Father, the court noted that "with him being incarcerated or on the run, he [had] not availed himself of any services that were available to him." On appeal, Father posits that DCS "had a difficult time providing reasonable efforts" to him, referencing Ms. Evans's testimony that Father's incarceration did "present a limitation." However, as Ms. Evans also testified, it was Father's own conduct that caused him to be incarcerated. Moreover, as the trial court found, Father "skipped out on his bail" and fled to Florida, making no contact with DCS until he was extradited to Tennessee several months later. The evidence preponderates in favor of the trial court's findings that factors (K) and (L) weighed in favor of termination.

Factors (M), (P), and (Q) all relate to the parents' actions to meet the Children's needs. We agree with the trial court's determination that all three of these factors weigh in favor of termination of Father's and Mother's parental rights. With respect to factor (M), the court found that the parents had failed to demonstrate a "sense of urgency in obtaining custody of the [C]hildren and addressing the reasons that the [C]hildren entered custody." The court reiterated that while the Children had been removed from the parents' custody for nearly two years, neither Father nor Mother had completed the requirements of the permanency plans. The parents' accrual of additional drug-related criminal charges, lack of contact with DCS and the Children for several months, and difficulties establishing a safe and appropriate home for the Children all illustrated their lack of urgency in addressing the circumstances, conduct, and conditions that led to the Children's removal from their care. These facts also apply to factor (P), whether the parents demonstrated an understanding of the basic needs required for the Children to thrive, and factor (Q), whether either of them demonstrated the ability and a commitment to creating a home that would meet the Children's needs. The court further found that the parents had failed to maintain regular visitation with the Children and failed to financially support them.

The trial court also weighed factor (O), whether the parents had ever provided safe and stable care for a child, in favor of terminating Father's and Mother's parental rights, finding that the parents had "failed to provide safe and stable care for the [C]hildren and for Arya." The court noted the termination of Father's and Mother's parental rights to Arya and the status of Mother's eldest child, Lydia, with whom Mother was allowed only supervised visitation. The evidence preponderates in favor of the court's findings. With respect to factor (S), the court found that the parents had "failed to provide more than token financial support for the [C]hildren." The court acknowledged that the parents had not been under a court order to pay child support. However, particularly as to Mother, the court found it "concerning" that Mother had "put money on [Father's] commissary" and "spent some of her money to help [Father] with . . . attorney expenses" while not contributing any funds to the Children's support. The evidence also does not preponderate against these findings.

Concerning factor (T), the parent's mental or emotional fitness, the trial court made no findings as to Father. As to Mother, the court determined that factor (T) weighed against maintaining her parental rights, finding that "the mental or emotional status of [Mother] would be detrimental to the [C]hildren and/or prevent [Mother] from consistently and effectively providing safe and stable care and supervision of the [C]hildren." The court explained that Mother had "admitted that she [had] been diagnosed with post-traumatic stress disorder, also suffer[ed] from anxiety attacks, and that she [had] done nothing to address those concerns." Mother also testified that she

- 37 -

suffered from agoraphobia. When questioned regarding how she would handle taking the Children to school and appointments, Mother responded: "Dropping them off where I don't have to associate with other people or getting someone that I'm comfortable around for support." The trial court's findings concerning Mother's mental and emotional fitness to parent were supported by the evidence.

The trial court apparently found factor (T) inapplicable to Father, and DCS presented no evidence of specific mental health concerns for Father. We note, however, that Father's history of substance abuse is problematic in terms of his mental fitness to parent the Children and that Father did not complete the permanency plan requirement of a mental health evaluation. We therefore determine that factor (T) weights, at best, neutrally for Father.

Moreover, the trial court determined that factor (N) weighed in favor of terminating Father's and Mother's parental rights because both parents had been found to have committed severe child abuse. The Children were born drug-addicted, and Father admitted to knowing that Mother had been taking drugs during the pregnancy. Additionally, the trial court's order terminating Father's and Mother's parental rights to Ayra reflected that Mother had taken illegal drugs during her pregnancy with Ayra as well. The court's findings concerning factor (N) were supported by the evidence.

In sum, the trial court's findings that all applicable best interest factors weighed in favor of termination were supported by clear and convincing evidence. As the trial court concluded, "The [C]hildren deserve to be able to be in a home where they are provided with structure, security, love, and a home that is free of drugs, criminal activity, and things of that sort." We therefore affirm the trial court's determination by clear and convincing evidence that termination of Father's and Mother's parental rights to the Children was in the Children's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's and Mother's parental rights to the Children and collection of costs below. Costs on appeal are assessed one-half to the appellant, Issac B., and one half to the appellant, Heather B.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE